The court has a mediator, and I don't know if this case is in a posture where it's still Your Honor, Seth Smigley, on behalf of Maximum Indemnity Company, Maximum issued a policy to Howard Nations, APLC. To answer your first question, the parties participated in the U.S. Fifth Circuit's mediation program unsuccessfully, which is why we are here today. It was unsuccessful, apparently. Louisiana Civil Code Article 3072 recognizes that a compromise must either be in writing or in open court, in which case the recitation shall be susceptible to being transcribed. There's no dispute here that there is no settlement in open court that's capably being transcribed. Therefore, this court has called upon the conducted de novo review of the available writings in the record to determine if there was, in fact, a settlement. And I think there's three lenses through which the court should be vacating the district court's ruling. Those are the application of Louisiana Civil Code Article 1947, alternatively, the lack of a written offer and a congruent written acceptance, third, there was no agreed-upon scope of the release in any of these writings. This court held in Deepwater, in Enray, Deepwater Horizon at 576 F. 3rd, 344, a settlement is valid and enforceable even if it contemplates parties signing a release at a later date unless the parties explicitly provide that a valid contract will not be formed until the parties execute a formal finalized agreement. The first e-mail, 16,735 in the record, you're going to find Maxim's response to the mediator's proposal dated December 29th. That e-mail says there is no actual settlement and no money is transferred to plaintiff's counsel unless and until all 148 plaintiffs across all the suits execute a mutually agreed-upon settlement release, excuse me, a release. That required two things, a mutually agreed-upon settlement agreement, not one side saying this is how it goes, not the other side saying how it goes, both sides had to agree on it. And then we needed all 148 plaintiffs to execute it. If any one of them didn't, it was going to fail. But the language in Maxim's e-mail that day tracks the unless and until language that this court required in the Enray, Deepwater Horizon case. However, that e-mail was not at a figure acceptable to the plaintiffs. It was $250,000 less than the figure they were negotiating for. The next e-mail you will find from Maxim is in response on January 5th to a purported term sheet received the prior day from opposing counsel. Once again, Maxim, in its e-mail response, looks at the draft term sheet and says, thanks for the draft term sheet. Not an agreement to the term sheet. And he wrote with the following comments. Maxim agrees that the cases have been fully and completely settled in principle. However, until such time as a mutually agreed-upon settlement releases are executed and provided by all 148 of our clients, there is in fact no settlement. Again, Maxim is following along this Court's guidance from the Enray, Deepwater Horizon by specifically stating there will be no consummation of a contract unless and until formal documents are finalized. The Court wants to know why that was so important to Maxim. It's because this was a complicated settlement. This was not a class action where Maxim and the defendants were going to benefit from an agreed-upon settlement that was going to potentially gain approval from a class certification proceeding. Class allegations had been dismissed. It's been stricken. So we were going to need 148 releases, separate and individual releases, from each one of these people. You have to have kill switches. That's what was in the release documents ultimately transmitted to the opposing counsel. Maxim wanted all various forms of protection. What happens to the people who are deceased? There were certain documents that Maxim was going to require to proceed to a settlement regarding deceased individuals. Were any of these folks minors? We didn't know. The Mississippi plaintiffs were newer to the game. We were still having a very underdeveloped case. We didn't know much about those. There were payment requirements. When were we going to be triggered to payment? How were we going to pay? What happens if they give us a release and it's not signed properly? It looks like it's signed by the wrong person. It could be anything. We ask for time to review and get back to them for corrective deficiencies. That's the conditions that were continually put in the references, unless and until we have a mutually agreed upon settlement release, the protection of those kill switches. The district court erred when it relied on the Parrish decision, administrators of Tulane and Waukegale. None of those decisions focused on Article 1947. Those were decisions that found the signing of the release was just something to happen afterward. It was not a condition on which the settlement was submitted by opposing counsel yesterday in the Burlington v. Hanover matter, which my firm handled. And in that case, we were on the other side of this. We were pursuing another carrier who had not used the unless and until language. And we convinced the court that we were correct, that they did not do it correctly. So when they point to that decision and said that my firm is familiar with it in their 28J letter, they are absolutely right. That was us pointing out to the court that somebody did not do what Maxim did in this case. Turning our attention then to the lack of written offer and acceptance, you have two letters from Maxim. January, the December 29th, January 5th. December 29th, not the number they agreed to, certainly not accepted. So now you have January 5th. That email says, we potentially, Maxim could potentially pay. They were in the process of doing an accounting. That's not an offer. We couldn't make the offer. It's an eroding policy limits. Limits are being eroded as things are moving forward. So that could not constitute a written offer and acceptance. The first offers on February 8th, when the documents get sent, the formal documents, March 6th come back with a tremendous number of red lines. The red lines have never been agreed to. There's no record evidence of a written offer and acceptance. Last, there's no agreed-upon scope of the release. As this Court has said, in Anthony and Davis, you have to have an agreed scope of the release. You look at the limited writings that are in this record, there's no scope of a release that's been agreed to anywhere. That's it. And so, based on that, I think this Court is compelled to vacate the district court ruling granting the plaintiff's motion to enforce the settlement. Thank you. Good morning, judges. I don't get to come here often. It's so exciting to be here. I am Judy Bernthorne. I represent the nation's insureds, and I'm here to talk to you about mandate, Anti-Injunction Act, and subject matter jurisdiction. First of all, quickly, mandate, I believe that Maxim has covered a lot of that, but in specifics, the mandate in this case has to be express and in writing. And the mandate in this case, expressly and in writing, does not state that it authorizes the release of the nation's attorney employees who were responsible for handling the subsistence claims that they allegedly handled committing malpractice. Those people need to be released, and the mandate being proposed and enforced upon us by the magistrate judge will not release those people. Secondly, the mandate is revocable, although it could have been drafted so that it was irrevocable. We didn't have a chance to look at it before it went out. People change their mind when they go into a settlement, and we really don't know how many of those mandates that plaintiff's counsel says he has them all right now, but we don't know if anybody changed their mind and said, no, I want more. So those are the problems with the mandate. How your argument dovetails with what Maxim just said, their explanation of what they had proposed is that they need individual signed releases from all whatever it is. Absolutely. The magistrate judge asserted that a mandate to us non-civil lawyers, she had to explain what that meant, would be a sufficient substitute, I thought. And what you are now arguing is that the mandates here, as prepared because irrevocable until some period of time, would not have been a valid substitute. Are you at least agreeing that the magistrate judge was on to something, that if a mandate would have served the same purposes, it would still it may have been sufficient, despite that that's not what the offers and counter-offers were referring to? No, not at all, Your Honor, because I've been in so many cases where there's a completely integrated, unambiguous contract where the plaintiff actually signed the contract, but yet we go to court and the plaintiff said, I didn't sign that contract until they showed the contract, and it's like, oh, yeah, I signed the contract. So I believe what we want is not to take away money from the plaintiff. We want a completely enforceable settlement. And no, a wet signature on a release is a much more enforceable release than a mandate, which if you look at the mandate, has none of the settlement terms. Well, but you're also not solely relying on that. You're saying that the settlement didn't include certain people that needed to be released. Correct. It did not include the people at the nation's firm who were actually handling the cases. That mandate did not authorize those people who were allegedly committed the negligence to be released. So that's mandate in an anti-injunction act in light of time. I'm just going to have to relate on anti-injunction act and say I believe that the court had no right to enjoin the Ackman case in state court litigation, and the only thing I can point the court to is the stranger's exception, which is briefed in our brief, is not something that takes away the anti-injunction act. Binding precedent from this court. If we were to reverse the settlement, then we don't have to reach that, do we? Correct. Absolutely. Now, I'm not saying we will reverse. I'm just looking at every piece that we need to look at. There's just so many exceptions to the anti-injunction act. I wanted to focus the court on that one, which to me is the only plausible one that still doesn't apply. In terms of subject matter jurisdiction, which is— The argument seems to me from the other side on the anti-injunction act, there's no injunction here. This is a settlement. There are obligations imposed on different parties. Whoever had the obligation in Mississippi had to go over there and get that released. It'd be a breach of the agreement if you couldn't get that release, get it dismissed, if you couldn't get the Ackman case or whatever the name of it was dismissed. I'm lost as how the anti-injunction act by the terms of this settlement would arise. Isn't it just an agreement to get something dismissed? It's not this magistrate judge and Judge Vitter ordering Mississippi court to do anything. Point to me to something in this non-agreement, in this proposed agreement, where the magistrate judge is ordering a Mississippi court to do something. The United States Supreme Court stated that it is insufficient. You can't circumvent the anti-injunction act by having the judge in the federal court direct the order to a party to do or not to do something in state court. That's clear black-letter law, and it's briefed in our— Well, it didn't. I don't understand the terms of the agreement, but I thought the only terms of the agreement is if we're going to settle this, part of the terms of the settlement is we have to dismiss our cases wherever they may be. Is that extraordinary in Louisiana? That you would have an agreement? It's extraordinary that— That you would agree to dismiss a case in order to settle, and if you don't get it dismissed, the case isn't settled. There's no settlement, and so therefore there should be no injunction by the federal court to tell the state court judge, dismiss your case. Well, that's why the question really is whether there was a settlement. That's why I asked that. If we ended up reversing on that, then we don't get to this point. If we ended up affirming, then maybe we do need to look at this question, but I guess I'm wondering, like, what exactly would we look at? Because if we're affirming, then as Judge Southwick says, they would have to dismiss certain cases. If they've sued in three different courts on the same point, and they settle that same point, then don't they have to dismiss all those cases? Even if— Not unless the state court judge in the state court case says you have to dismiss that. I think it's a violation of the— No, but if you settle, I mean, that doesn't make sense to me, because if you settle, even if your case is in England, you've settled. You need to go request a dismissal, and I don't know all the law in England, but it seems to me that when you request a dismissal as a plaintiff, then you get it. Dismissal with prejudice, you get it. You should contractually, but who's going to enforce it is the question, and I just don't know. The subject matter jurisdiction, which I had really planned to use most of my time on, but if you look at the evidence, there's no way to get to 2,000 people, and that's documented in the record, and the estimate that there'd be 40,000 per person recovery is way out of line when the plaintiff's own expert says it's 14,500. So how do you get from 14,500 to 40,000? You can't, and in fact, the matter— Counsel, Counsel, your time is up. You have your brief. We have your brief on all this. Okay. Thank you. This isn't in it, but— Thank you. I won't read it. And you have time for rebuttal. There's one thing I wanted to say. The magistrate's— Counsel, have you appeared before this Court before? Yes. Okay. Well, your time is up. Oh, I thought you said that I could read one thing. I'm sorry. That's all right. Okay. Well, he said you have time for rebuttal, which is after. Well, okay. I'll read the thing that the magistrate said in rebuttal. Thank you. Well, I'm sorry. We have the miscommunication. Good morning. My name is Gerald Block, and this is my 53rd year of practice in law, and if this is a bad settlement, then I have never seen a good one. Plain and simple, this is what took place. There was an agreement, a settlement agreement in mediation in front of the magistrate judge. Everybody agreed. And Mr. Schmeichel says today, he gets up and he says, he reads a part of his email, but what he didn't read is, Maxim agrees that the above-captioned cases have been fully and completely settled in principle. That email is dated January the 5th. Maxim agreed. Nations agreed. Everybody else agreed. The only question was that Judge VanMierville said, I'm going to give you, meaning the plaintiffs, a couple of days to go ahead and communicate with our clients. We did. And so we then came back to Judge VanMierville and we said, we got a deal. And she wrote, we have a deal. That's what she wrote. Now, we all know that the practice of law is a collective endeavor. And so you need the court, you need defense counsel, you need plaintiff's counsel, third-party counsel, et cetera. But once there's an agreement, then there's an agreement. And everybody has to understand, your word is your bond. And in this particular case, our word was our bond. We agreed that there was a settlement. Now, they talk about mandates. But they don't provide any information to this court, and they didn't provide any information to Judge VanMierville, that mandates are illegitimate. In fact, they are legitimate. And I think it is kind of the height of audacity that in this particular case, the actual fee contract between the lawyers and the clients basically provided for a power of attorney for them to sign. It says, the attorneys are granted a limited power of attorney with full authority to prepare, fully execute, sign all instruments to reasonably conclude this representation as fully as client could do in person. In other words, the nation's defendants provided in their fee contract for a power of attorney. It's in there, and that is... Are you saying that though the counsel in trying to settle a case could not insist on something else, that is at least the position being taken by Maxim, that these actual documents going back and forth and emails says we want releases signed by whatever number of people there is, 148 plus others. So doesn't that override whatever you just read? That's what we want to settle. You don't give us that, we don't settle. Well, Judge Southwick... You're saying it's the equivalent. Maybe it is, maybe it isn't. But in a settlement, it's a contract. And whatever the terms of the contract are, you're not looking at equivalents necessarily. You tell me where I've gone astray yet again. So my question is this. So let's suppose there's a trial and everybody agrees that there's going to be a settlement. And now the trial is bumped. And what happens then after the fact, after the settlement, one of the parties changes the terms and basically now insists that there's going to be different terms. In the settlement agreement they sent to me, that I redlined, it basically released whistleblower claims. It released a certitude of vicinage. I don't even know what vicinage means. But the settlement agreement that they provided to me, that I redlined, because I said this is not what we agreed to, they insisted that that document, that settlement agreement, which released claims related to BP, primarily medical claims, that had nothing to do with this case. All we were dealing with was subsistence claims under the BP settlement document. But what they did, and I think it was deceitful, what they did is they came back and they changed the terms of the settlement agreement and they basically came back and said, no, we want this very broad release. And I was like, but the only thing we had here was claims for legal malpractice based upon the subsistence claims. They included whistleblower claims, they included engineering claims, they included all of these type of claims that had nothing to do with subsistence. And so, I guess... I'm sorry, Judge. I want to make sure that you're talking about... We're talking about the claims that could be brought by the plaintiffs against nations, correct? That's correct. And so, again, you've been at this 53 years, you know more about all this than I do, even though I've been a lawyer almost as long as you, but you've been much more involved in the real world. And it seems to me it's not extraordinary, at least in the abstract, that if you're settling a case, the defendant wants all possible claims. I'll settle this for X dollars, I don't want to be sued tomorrow for Y dollars on other claims. So you look for a global settlement. So I don't know if your argument is primarily that they change the deal or that the deal is somehow an extreme one. It sounds to me fairly reasonable in the abstract that you want everything that you might bring against me once we settle this off the table. That sounds right. So is your main problem, is that they change the deal, in your view, or that that is just an improper term in the first place? They change the deal. So that's the basis of our argument, is that we only agreed, and this was part of the negotiation in the mediation, we only agreed that there would be a release of the subsistence claims. And let me explain to you why. Because we did not know whether there were some claimants that we represented that may have had medical claims that Howard Nations was handling. We didn't know. They knew, but we didn't know. Now, later on, they came back and they told us after the fact, you know, Howard Nations wasn't handling any medical claims for any of our clients. But yet they changed the deal, and that's where our objection is. They came back and they basically said, look, we now want a broad release that had never been contemplated at all. So the concern was the breadth of the release and not that we want a release signed by each plaintiff in the case against Nations. We want a release signed by them. Not by their lawyers. We want it signed by them. That wasn't the concern, because I was thinking that was the concern about having all the releases. Okay, but here's the situation. They changed the scope. They changed the breadth of it, as you just described. They did that. And they did it knowing full well that that had never been part of it. Then they came back and they said... I'm asking, my question, I think, is a lot more direct and simple than that. All I'm asking is, my thought that there was some concern about who would be signing releases, that wasn't a concern. No, I was going to get to that. I'm going to answer your question. So then they came back and they said, well, look, we want to make sure all the plaintiffs, 148 plaintiffs, sign off. And we want them to sign the release and we want there to be a notarized document. And we said, very early on, in my January 4th term sheet, that we were going to use mandates. In other words, we were going to have... And the mandates are in the record. You can see the mandates that are in the record that we were going to use. And it authorized us to sign on behalf of all of our 148 clients. That's legally binding. And if one of those plaintiffs would come back now and they say, change their mind, that would be on us. That would be on... Well, but whatever the effect of that, if what I say to you is that's not enough for me, I want each individual plaintiff to sign themselves. If I'm insisting on that and you're insisting that these mandates are enough, we don't have a deal, do we? Well, I think we do. And I think we do because what's the difference? In other words, if it's legally binding for the mandates, then what difference does it make? It's a distinction without a difference. Is that you're saying, I want notarized agreements that they have to sign. Why? Why? There are plenty of agreements. There are plenty. Well, I can think of several reasons why. One is that somebody could come back later and say, I never signed anything. I didn't even know this settlement was happening. But if I have their signature on a release, it makes that argument less likely later. But if I sign or our law firm signs on behalf of those plaintiffs who we represent, then that is legally binding. And if they come back and they basically now say we are not going to agree to this. I didn't know that. I didn't know that settlement was out there. Well, this whole case is about what lawyers represented to clients who the clients now claim didn't happen. That's what this whole case is about. You can go ahead, but I understand why they wouldn't sign. Well, and I appreciate Judge Kerr's questions, but that isn't the whole case here. It's not just the signing versus mandating, right? There's a lot else. And isn't that the problem with settlements? I mean, yes, I don't have 53 years as a lawyer and I don't think I ever will because I've been a judge for a good number of the years. But when I was a lawyer, I did go to mediations and we would settle. And one thing we did was sign at the mediation because we knew if you go home, things might change. And so, I do remember that there were always a little la-la-la-la-la until there really, really was a final contract that everybody agreed on. And I can remember a lot of la-la-la. So even though that's irritating as a lawyer, isn't that common? Well, I would have to say as I stand here today, I have never had this type of problem before ever. Wow. Well, I had it. Not once. And so, I understand that there is a public policy  that this court, I think, should honor. And that is if you take a case like this, 90%, maybe 99% of the cases in federal court, the lawyers call, they contact the court, they say, we have an agreement. And the judge issues a conditional order of dismissal, right? And basically says, I'm going to retain jurisdiction over that. Now, what happens with the either plaintiff or defendant, that then on the settlement agreement, which everybody knows is going to be coming down as part of this, what if one of those parties, in bad faith, changes the terms of the settlement agreement? That's what happened in this case. They changed the terms of the settlement agreement. They made it different than it had been. I appreciate that that is your perception, but their perception is there never was a settlement agreement. Well, Judge Van Mervel disagrees. And I respect that. And I'm not pretending I had a magistrate judge tell me something I didn't follow, so that's not what I was saying before. What I was saying before was just when there are settlements, sometimes you walk out the door thinking the other person agrees to X, and then they go, no, I meant Y. And so what do you do with that? Let me ask you this. If we were to rule in your favor, what does our conclusion say in our opinion about this? Because it would affect other settlements whether we publish it or not. So tell me. Right. And I think what the conclusion says is there was a valid legal settlement enforceable and that the settlement agreement should be as Judge Van Mervel said should be limited in scope to the subsistence claims. It should not include settlement of the servitude of visinage or whistleblower or any of those medical claims. It should be a settlement of the subsistence claims. That's what it should say. Now, if the court says okay, and we want to impose a condition on it that everybody signs off on it and we get notarized statements. Okay. That gets rid of the mandate issue and the court could certainly say that's what we think the defendant has bargained for and they're entitled to it. But I'm not licensed to treat their paranoia. I don't know what is going to happen with a particular plaintiff in a particular case at any particular point in time. However, I do believe that when you look at something like this and you're dealing with honorable people who want to put a case past everybody that that should be the result from this court is that like Judge Van Mierveld said you can look at this a million different ways but one way you have to look at it is there was a settlement. They agreed to a settlement. Then things changed. But they changed by these defendants coming in and making those changes. They never said this at the beginning. If they had said this  were negotiating with Judge Van Mierveld they would have said we want, as Judge Van Mierveld said, a complete release of everything. Then we wouldn't have had a settlement. We wouldn't have agreed to that because we didn't know what claimants were still out there and we would not settle a medical VP claim that we weren't representing them on. So I do think there is a way for this court to make a decision and the decision would be that the settlement agreements, if Judge Graves, you believe that that was part of the negotiation and that's part of what they insisted on and that's what they wanted and that gives them some comfort if there's any such thing in the practice of the law as having comfort then sure that's fine then this court can do that but it is not fair for somebody to come and it seems it's against public policy to insist that there's going to be a settlement, to agree to a settlement and then to change it after the fact. That just makes no sense to me as a lawyer having done this for a long time and I I'm fine with whatever the court says but I do think that there was a settlement, Judge Van Millville agreed there was a settlement she agreed importantly that the defendants changed the scope of the settlement agreement and that the mandates were valid. Thank you very much. Thank you. Your Honor, Seth Spickley I'll be brief it was more than the mandates it was everything, the kill switches we talked about Let me ask you this, when the magistrate announced on whatever day it is January 4th, emailed that we have a settlement what was she overlooking on that day? What had not yet been agreed to? In the record there's nothing supporting anything as a court of record but I will tell you what she's missing is by January 5th email it was very clear in all my communications starting with December 29th, we don't have the money available to do the number you want us to do. She knew that at all times I suspect this was a means to just get it off the trial docket I don't think anybody thought we were going to end up where we did clearly my client spent a lot of time generating the documents, it thought it was going to get signed On January 2nd she sends something that is somewhat tentative and two days later she thinks they have a settlement. Did anything happen in those two days? Or then you got it closer to the trial date you're saying? Well that I think the plaintiffs were trying to decide what they were doing I think she says on January 2nd stop working on the files I'm waiting to hear from the plaintiffs, January 4th we have a deal there's a settlement there could be no deal one, all of the communications in the record say that it's going to be in less than until we get this formal contract two, the January 5th email just like the December 29th email says Maxim doesn't know how much money it has left, it can't do a deal yet it just, it couldn't make the offer without knowing how much was left on the policy. When did the issue of actually executed 148 plaintiff documents versus mandates? Well actually it starts at the mediation but that's not in the record on December 16th, it's in the record on December 29th when it's in my, that offer at $250,000 less makes the 148 mutually agreed upon releases in the record, in the email, and again on January 5th when I get this proposed term sheet I said wait we don't have the money yet, I told you an accounting and an audit is underway oh by the way, there's still got to be these conditions requiring mutually agreed upon releases, the 148 that is at pages 16,753 and 16,735, you're going to find that in both of those. And here's the issue this is just like in Anthony and in Davis, those are personal injury cases where the lawyers thought they had settled the deal, one thought it was bodily injury, property damage only the other thought it was for everything when did that come to fruition? when they exchanged the release that's when we learned the scope of the release Max was being accused of changing the terms, Max had a very different understanding of what was going on and it's not until the draft documents get exchanged do you learn that, there's no record evidence of what the scope of the release was, that's the problem here, amongst the other things that we still have the conditional compliance with Louisiana Civil Code 1947 thank you counsel let me apologize again for misunderstanding, I'm sorry read what you're going to read, I was going to read, can we jump back in our minds to subject matter jurisdiction the magistrate said in her mediators proposal plaintiff's counsel despite robust publicity only generated 130 file transfer requests, how did they calculate the class would have been over 2,000 people that's authenticated it's record 5697 and we've submitted in our briefs so many things showing that these things that the plaintiffs relied upon in the Deepwater Horizon subpoena were not counting people, they were counting claimant identification people to get over 2,000 if you go in and try to put in a claim and you miss the social security number, you've got to turn it off and start it again but you got one claim number and if you do it again and you mess up that person's name, you've got to turn it off and do it again and you've got two claim numbers, then you're going to have to do a third one to get it right so it's kind of like the subpoena as documented by the people who worked with that portal just had big problems and yes, they were accurate but they were accurate representing claimant ID numbers not people in the class and there's no way they could have gotten a putative class over 2,000 and if you look in their pleadings, they say that the per person recovery would be $40,000 when their expert says it would only be $14,500 and the average for the whole program was $7,700 they can't make a mountain controversy under CAFA but I can tell you that the magistrate and her mediators proposal said the clients have to sign the settlement. The clients always had to sign the settlement that's never been changed the first time we heard of a mandate was after the magistrate announced a settlement and Mr. Block said a cheat saying oh, we're going to use a mandate the mandate doesn't have any terms of the settlement. Under Louisiana professional responsibility, you have to inform people of a multi-party settlement what's going on in the settlement and so the mandate is just spartan it's ineffective to release the people who need to be released and it was never agreed to change the terms of the deal the plaintiff is the one who changed the terms of the deal because the magistrate said plaintiff signs on a wet signature we were not willing to give that up and that was the big change and I'm red again so thank you for very much and I'll learn the rules better. Thank you so much I think you probably know the rules that is am I overlooking somebody I think everybody has had their rebuttal that is our arguments for today. We are in recess until tomorrow at 9am